**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------- x

WELLS FARGO BANK, NATIONAL
ASSOCIATION, AS TRUSTEE FOR THE
REGISTERED HOLDERS OF AMHERST
PIERPOINT COMMERCIAL MORTGAGE
SECURITIES, LLC, MULTIFAMILY
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2019-SB59, *et al.*,

Plaintiffs,

vs.

ALJO NORSE LLC, SETH LEVINE, *et al.*,

Defendants.

---------------------------------------------------------- x

Civil Action No. 19-cv-17866 (MCA)(LDW)

**DECLARATION OF JOSEPH BRECHER
IN SUPPORT OF RECEIVER'S MOTION
TO APPROVE SALE OF PROPERTY
FREE AND CLEAR, AUTHORIZING
DISTRIBUTION OF SALES PROCEEDS,
AND GRANTING OTHER RELATED
RELIEF**

JOSEPH BRECHER, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am an Executive Managing Director of Gebroe Hammer Associates ("GH"), and I have personal knowledge of the facts and circumstances set forth in this Declaration unless otherwise indicated.

2.      I submit this Declaration in support of Colliers International NJ, LLC's ("Receiver") motion to approve the sale of the property located at 125 6th Avenue, Clifton, NJ 07011 (the "Subject Property"), to authorize the Receiver to disburse the net proceeds from the sale, including the brokerage commission due to GH in connection with the sale, and for related relief incidental to consummating the sale (the "Sale Approval Motion"),

3.      GH is a duly licensed commercial real estate brokerage firm that was founded in 1975 and has actively engaged in the marketing and sale of hundreds of commercial properties in New Jersey during that time.  I obtained my NJ Real Estate Salesperson license #0121944 on

4/30/2001, have worked with GH since 5/1/2001, and have been GH's Executive Managing Director since 2017.

4.     On or about August 27, 2020, GH entered an Exclusive Rights Agreement ("Agreement") with the Receiver that appointed GH as the Receiver's exclusive agent for the properties that are at issue in the above-referenced action, and identified in Schedule A to the Agreement. Attached hereto as **Exhibit A** is a copy of the Agreement.  The Agreement was also agreed to and accepted by Wells Fargo Bank, National Association, as Trustee for the Registered Holders of Amherst Pierpoint Commercial Mortgage Securities LLC, Multifamily Mortgage Pass-Through Certificates, Series 2019-SB59 ("Wells"), a plaintiff in this action who I understand to be the first priority mortgagee for the Subject Property.

5.     Pursuant to the Agreement, GH was charged with, among other things, marketing and procuring a sale of the properties listed in the Agreement without representation or warranty as to the condition of the properties.  With respect to the Subject Property, the Agreement provides that GH is entitled to a commission of 5% of the purchase price, which is to be paid from sales proceeds following approval of the sale by this Court.

6.     In connection with the Subject Property, GH was provided an appraisal report for the Subject Property dated October 12, 2020 (the "Appraisal Report") prepared by an independent, third-party appraiser, CBRE Valuation & Advisory Services, which estimates the fair market value of the Subject Property at $1,550,000.00.  Attached hereto as **Exhibit B** is a copy of excerpts from the Appraisal Report.

7.     Although GH did not make any representations to prospective purchasers regarding the physical conditions of the Subject Property, in my experience, the $1,550,000 fair

market value identified in the Appraisal Report is reasonable and consistent with industry standards.

8.      In its capacity as broker, and in compliance with applicable law, industry standards, and the Agreement, GH engaged in an extensive marketing campaign to sell the Subject Property.  Among other things, GH marketed the Subject Property on multiple online platforms, and performed email blasts that reached over 480 prospective purchasers.

9.      GH's marketing efforts resulted in 64 confidentiality agreements and 4 written offers from prospective purchasers.

10.     On December 18, 2020, GH received a non-binding Letter of Intent (the "LOI") from Stonegate Buildings LLC or its assignee ("Purchaser") to purchase the Subject Property for $1,950,000.00, which is the highest price offered for the Subject Property.  A true copy of the LOI is attached hereto as **Exhibit C**.

11.     Consistent with other offers GH received, Purchaser required that any purchase of the Subject Property result in the transfer of clear tile to the Subject Property, free and clear of all prior liens, claims, and encumbrances.

12.     My understanding is that Receiver and Purchaser entered into an Agreement of Purchase and Sale for the Subject Property on or about April 7, 2021 (the "PSA"), that Wells has agreed to the terms of the PSA, and that no other parties with an interest in the Subject Property have objected to the terms of the PSA.

13.     GH believes the price offered by Purchaser for the Subject Property, which is in excess of the fair market value estimated in the Appraisal Report, presents the best opportunity to effect a sale of the Subject Property, and joins in the Receiver's motion to approve the sale and

to authorize the Receiver to disburse the net proceeds, including a disbursement of $97,500.00 to GH for its 5% brokerage commission in connection with this sale.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 9, 2021.

_____

JOSEPH BRECHER

# Exhibit A

## Exclusive Right Agreement

This Exclusive Right Agreement ("**Agreement**") made as of August 27, 2020, between Colliers International NJ LLC, having an office at 300 Interpace Parkway, Parsippany, New Jersey 07054, in its capacity as the Court-Appointed Receiver (the "**Receiver**") for that certain real property identified and described on Schedule A annexed hereto and incorporated herein (hereinafter, the "**Receivership Properties**"), and as more fully described on Exhibits A and B to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, *U.S. Bank National Ass'n v. Englewood Funding, LLC, et al.*, Civil Action No. 19-cv-17865-MCA-LDW (the "**Action**"), and Gebroe-Hammer Associates in its capacity as a real estate broker (the "**Agent**"). Agent represents that it is a duly licensed real estate broker in the State of New Jersey.  Receiver and Agent intending to be legally bound hereby agree as follows:

1.        Receiver hereby appoints and directs Agent to serve as Receiver's sole and exclusive agent granted with the sole and exclusive right to procure a sale or any other acceptable transfer of one or more of the Receivership Properties (including all improvements now or hereafter made and all appurtenances thereto), except in connection with any sale or other transfer of any of the Receivership Properties made to a sponsor of the defendant in the Action or effectuated under the applicable pooling and servicing agreement (the "**PSA**") governing plaintiff (i) Wilmington Trust, National Association, as trustee for the registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB55, (ii) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB57, (iii) Wells Fargo Bank, National Association, as trustee for the registered Holders of Amherst Pierpont Commercial Mortgage Securities LLC, Multifamily Mortgage Pass-Through Certificates, Series 2019-SB59, and (iv) Wilmington Trust, National Association, as trustee for the registered Holders of Credit Suisse First Boston Mortgage Securities Corp. Multifamily Mortgage Pass-Through Certificates, Series 2019-SB61 (collectively, "**Plaintiff**") (collectively a "**Sale**") as contemplated, set forth, and agreed in the Receiver Order (defined below), and certain additional orders entered in the Action, and Agent accepts such sole and exclusive right consistent with the terms of this Agreement and the Receiver Order (defined below). References herein to the Receivership Properties shall be understood to include all or any portion of one or more of the Receivership Properties. Plaintiff acknowledges that Receiver's authority to sell or transfer the Receivership Properties, or to direct the sale or transfer of the Receivership Properties, is defined and set forth in: (i) the Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, by the United States District Court for the District of New Jersey (the "**Court**") in the Action, and in all related actions identified therein (the "**Receiver Order**"), (ii) the Order Setting forth Sale Procedures, entered on May 29, 2020, by the United States District Court for the District of New Jersey in the Action (the "**Sale Procedures Order**"), and (iii) any other orders that have been or may be entered by the Court in the Action. The parties to this Agreement agree and acknowledge that Agent's ability to consummate a sale transaction for one or more of the Receivership Properties is subject to the approval of Plaintiff, any other party required by the Court to consent to the sale, and the Court that entered the Receiver Order, as set forth in Paragraph 6(i) of the Receiver Order.

2.        During the term of this Agreement, Plaintiff and Receiver agree to refer to Agent all offers, inquiries and solicitations related in any way to a Sale and Agent agrees to investigate and develop such offers, inquiries and solicitations.  All negotiations shall be conducted through Agent with assistance and input from Plaintiff and Receiver.  Agent agrees to assist Plaintiff and Receiver in gathering information to enable Plaintiff and Receiver to make a determination as to the credit worthiness of any prospective purchaser (including any designee, successor assignee or related entity hereinafter collectively "**Prospect(s)**"), but the determination to accept or reject a Prospect shall be made by Plaintiff and Receiver. Plaintiff shall not rely on Agent, and Agent shall have no liability, for the financial condition or credit worthiness of a Prospect.  Plaintiff and Receiver will be responsible for determining the legal sufficiency of a Sale and any other documents relating to any transactions contemplated by this Agreement. Plaintiff and/or Receiver shall supply Agent with a copy of the contract of sale upon request by Agent.

3.     This Agreement shall become effective as of the date hereof and shall continue for an initial term of nine (9) months.  Thereafter this Agreement shall continue on a month-to-month basis unless and until either party hereto shall serve written notice of cancellation to the other party at the address set forth above, in which event this Agreement shall terminate thirty (30) days after the service of such notice.  The date that this Agreement shall terminate shall hereinafter be referred to as the "**Termination Date**."  Within ten (10) business days after the Termination Date, Agent shall deliver to Plaintiff: (i) a list of all Prospects who have toured any of the Receivership Properties and/or have submitted or received written offers with respect to a Sale of one or more Receivership Properties, and (ii) a list of any pending, proposed and incomplete transactions in connection with a Sale.  In the event that a Sale is completed (or a contract of Sale is executed) with a Prospect (defined below) within one hundred twenty (120) days after the Termination Date, Agent shall be paid a commission in accordance with the terms of this Agreement as if the Termination Date had not occurred.  In the event a Sale is still being negotiated with a Prospect (defined below) at the time such one hundred twenty (120) day period expires, then the one hundred twenty (120) day period shall be further extended for an additional one hundred twenty (120) day period and Agent shall be compensated as if this Agreement were in full force and effect.  For purposes of this Section, Prospect shall include (i) a Prospect whom Agent, during the term of this Agreement, had negotiations regarding a Sale, or from whom Agent received a written offer to purchase any or all of the Receivership Properties, (ii) a Prospect that has executed a confidentiality agreement, and/or (iii) a Prospect that is on a list of Prospects prepared by Agent and delivered to Plaintiff within ten (10) business days following the expiration or termination of this Agreement.

4.     Intentionally omitted.

5.     Intentionally omitted.

6.     Agent is a national brokerage firm and that in some cases it may represent Prospects.  Plaintiff desires that the Receivership Properties be presented to such persons or entities, and consents to the dual representation created thereby.  Agent shall not disclose the confidential information of one principal to the other.

7.     Neither Receiver nor Agent is obligated to and has made no independent investigation of the physical conditions of the Receivership Properties including, but not limited to, the condition of any structures (exterior and interior) on the Receivership Properties, the electrical and mechanical systems thereof, the fixtures, personal property and equipment therein, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "**Physical Conditions**").  All documents and materials, investigations, reports and information with respect to the Physical Conditions may be furnished to Prospects, as may be required by the Receiver Order or Sale Procedure Order. Agent acknowledges that neither Plaintiff nor Receiver shall make any representations or warranties regarding the Physical Conditions of the Receivership Properties. As such, Agent shall advise all Prospects that the Receivership Properties shall be sold "AS IS, WITH ALL FAULTS, KNOWN OR UNKNOWN," without representation or warranty of any kind and in their present condition.

8.     The validity and interpretation of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey applicable to agreements made and to be fully performed therein (excluding the conflicts of laws rules).  The parties hereto irrevocably submit to the jurisdiction of the Court in the Action for the purpose of any suit, action, or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby. Neither party shall be liable for consequential, punitive, special, exemplary or similar type damages.  In the event that any litigation is brought with respect to any dispute between the parties hereto, the losing party in such litigation shall reimburse the prevailing party for all of its reasonable out-of-pocket costs incurred, including reasonable attorney's fees and disbursements, in connection with such litigation and the costs of collection of any settlement or judgment thereon.

PLAINTIFF, RECEIVER, AND AGENT KNOWINGLY AND VOLUNTARILY WAIVE THE RIGHT TO A JURY TRIAL IN THE EVENT OF A DISPUTE ARISING UNDER THIS AGREEMENT.

9.     Each signatory to this Agreement represents and warrants that (s)he has full authority to sign this Agreement on behalf of the party for whom (s)he signs and that this Agreement binds such party, subject to any limitations, restrictions, or obligations contained in the Receivership Order, the Sale Procedure Order, or another order entered in the Action.

10.   The Receivership Properties will be offered in compliance with all anti-discrimination laws.

11.   This Agreement constitutes the entire agreement between Receiver and Agent with respect to the subject matter hereof and supersedes all prior discussions, negotiations and agreements, whether oral or written.  No amendment, alteration, cancellation or withdrawal of this Agreement shall be valid or binding unless made in writing and signed by Receiver and Agent.  This Agreement shall be binding upon, and shall benefit, the heirs, successors and assignees of the parties. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute a fully executed agreement, with the same effect and validity as a single, original agreement signed by all of the parties.  Facsimile and PDF signatures shall have the same validity and effect as original signatures.

The undersigned Plaintiff hereby acknowledges receipt of a copy of this Agreement.

*Agreed and Accepted:*

Gebroe-Hammer Associates, as Agent

By: _____
    Name: Joseph Brecher
    Title: Executive Managing Director

Print: Joseph Brecher

*Agreed and Accepted:*

Colliers International NJ LLC, as Court-Appointed Receiver for the Receivership Properties, Pursuant to the Receivership Order,

By: _____
    Name:  Richard J. Madison
    Title:   Executive Managing Director

Print:   *Richard J. Madison*

*Acknowledged by and Agreed and Accepted by:*

Wilmington Trust, National Association, as trustee for the registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB55

By: KeyBank National Association
    a national banking association,
    as authorized agent

By: _____
    Name: Mike Jenkins
    Title: Vice President

Print: Mike Jenkins

U.S. Bank National Association, as Trustee
for the Registered Holders of Wells Fargo
Commercial Mortgage Securities, Inc.,
Multifamily Mortgage Pass Through
Certificates, Series 2018-SB57

By: KeyBank National Association
    a national banking association,
    as authorized agent

By: _____
    Name: Mike Jenkins
    Title: Vice President

Print: Mike Jenkins

Wells Fargo Bank, National Association,
as trustee for the registered Holders of
Amherst Pierpont Commercial Mortgage
Securities LLC, Multifamily Mortgage
Pass-Through Certificates, Series 2019-
SB59

By: KeyBank National Association
    a national banking association,
    as authorized agent

By: _____
    Name: Mike Jenkins
    Title: Vice President

Print: Mike Jenkins

Wilmington Trust, National Association,
as trustee for the registered Holders of
Credit Suisse First Boston Mortgage
Securities Corp. Multifamily Mortgage
Pass-Through Certificates, Series 2019-
SB61

By: KeyBank National Association
    a national banking association,
    as authorized agent

By: _____
    Name: Mike Jenkins
    Title: Vice President

74537451

Print: Mike Jenkins

**Consult your advisors.** This document has legal consequences.  No representation or recommendation is made by Agent as to the legal or tax consequences of this Agreement or the transaction(s) which it contemplates. These are questions for your attorney and financial advisors.

## SCHEDULE A

*U.S. Bank National Association v. Englewood Funding, LLC, et al.*
*Civil Action No. 19-cv-17865-MCA-LDW*

| Property Address | Property Owner | Property Name |
|---|---|---|
| 12 Meadow Road, Pennsville, New Jersey 08070 | Penn Norse, LLC | Penn Terrace Apartments |
| 357 and 363 West End Avenue, Elizabeth, New Jersey 07202 | Elizabeth Norse, LLC | 357 West End Avenue |
| 123 Pierre Avenue, 132 Jewell Street Aka 113-115 Banta Avenue, 77 Prospect Street, Garfield, New Jersey 07026 | Garfield Norse, LLC | Garfield Portfolio |
| 197-199 Grant Street And 359-361 Gordon Street, Perth Amboy, New Jersey 08861 | Plainfield Norse, LLC | 197-199 Grant Street And 359-361 Gordon |
| 212, 214, and 225 Atlantic Avenue, Atlantic City, New Jersey 08401 | Atlantic Norse, LLC | 212 Atlantic Avenue |
| 76-90 Dehart Place, Elizabeth, New Jersey 07202 | Dehart Norse, LLC | 76-90 Dehart Place |
| 512 26th Street, 530 28th Street And 540 28th Street, Union City, New Jersey 07087 | Union City Funding, LLC | 512 26th Street, 530 28th Street And 540 |
| 2911 Bergenline Avenue And 714 22nd Street, Union City, New Jersey 07087 | Union Ventures, LLC | 2911 Bergenline Avenue And 714 22nd Street |
| 17 Teaneck Road, Ridgefield Park, New Jersey 07660 | Jordan Ventures, LLC | 17 Teaneck Road |
| 126 6th Avenue, Clifton, New Jersey 07011 | ALJO Norse, LLC | 126 6th Avenue |
| 2817 Palisade Avenue, Union City, New Jersey 07087 | 2917 Palisade Ventures, LLC | 2817 Palisade Avenue |

| Property Address | Property Owner | Property Name |
|---|---|---|
| 337 And 339 Washington Street, Perth Amboy, New Jersey 08861 | Amboy Norse, LLC | 337 And 339 Washington Street |
| 66-68 Wallis Avenue Jersey City, New Jersey 07306 | Wallis Norse, LLC | 66-68 Wallis Avenue |
| 337-341 68th Street, Guttenberg, New Jersey 07093 | Palisade LM, LLC | 337-341 68th Street |
| 95 Jewell Street, Garfield, New Jersey 07026 | Raleigh Norse Management, LLC | 95 Jewell Street |

## SCHEDULE B

### Sale Commission

Agent shall be paid a commission as set forth in the schedule below for the sale of any of the individual Receivership Properties. The commission shall be included on the proposed distribution schedule for all sale proceeds, as set forth in Paragraph 7 of the Sale Procedures Order, and shall be paid from the sales proceeds for any Receivership Property at the closing, together with all sums due to Plaintiff, Receiver, and any other secured creditors, without deduction or offsets of any kind.

| Property Name | Commission* | Hurdle Commission |
|---|---|---|
| Penn Terrace Apartments | 3% of the gross purchase price | N/A |
| 357 West End Avenue | 2.75% of the gross purchase price | 10% of any sale proceeds in excess of $3,540,000 |
| Garfield Portfolio | 3% of the gross purchase price | 10% of any sale proceeds in excess of $3,790,000 |
| 197-199 Grant Street And 359-361 Gordon | 4% of the gross purchase price | 10% of any sale proceeds in excess of $1,060,000 |
| 212 Atlantic Avenue | 3% of the gross purchase price | N/A |
| 76-90 Dehart Place | 2.75% of the gross purchase price | 10% of any sale proceeds in excess of $4,010,000 |
| 512 26th Street, 530 28th Street And 540 | 2.75% of the gross purchase price | 10% of any sale proceeds in excess of $3,550,000 |
| 2911 Bergenline Avenue And 714 22nd Street | 2.75% of the gross purchase price | 10% of any sale proceeds in excess of $2,210,000 |
| 17 Teaneck Road | 5% of the gross purchase price | 5% of any sale proceeds in excess of $1,960,000 |
| 125 6th Avenue | 5% of the gross purchase price | 5% of any sale proceeds in excess of $1,890,000 |
| 2817 Palisade Avenue | 2.75% of the gross purchase price | 10% of any sale proceeds in excess of $1,800,000 |
| 337 And 339 Washington Street | 4% of the gross purchase price | 5% of any sale proceeds in excess of $1,360,000 |
| 66-68 Wallis Avenue | 5% of the gross purchase price | 5% of any sale proceeds in excess of $1,310,000 |

| Property Name | Commission* | Hurdle Commission |
|---|---|---|
| 337-341 68th Street | 2.75% of the gross purchase price | 10% of any sale proceeds in excess of $1,260,000 |
| 95 Jewell Street | 5% of the gross purchase price | 10% of any sale proceeds in excess of $820,000 |

\* Gross purchase price shall include the gross purchase price or other consideration (including without limitation any existing mortgage that is assumed)

Miscellaneous

**In the event Receiver fails to make payments within 30 days of the time limits set forth herein, then from the expiration of the such 30 days period until paid the delinquent amount shall bear interest at the lesser of the maximum rate permitted by law in New Jersey or the rate of ten percent (10%) per annum.**

# Exhibit B

CBRE VALUATION & ADVISORY SERVICES

# APPRAISAL
# REPORT

125 6TH AVENUE
CLIFTON, NEW JERSEY  07011
CBRE GROUP, INC. FILE NO. 20-047NE-0987-1

HERRICK

CBRE

VALUATION & ADVISORY SERVICES



Park 80 West Plaza Two
Saddle Brook, NJ  07663

T  201-712-5600
F  201-712-5650

www.cbre.com

October 12, 2020

Mr. Scott T. Tross
Partner
Herrick
One Gateway Center
Newark, NJ  07102

RE:      Appraisal of: 125 6th Avenue
             Clifton, Passaic County, New Jersey
             CBRE, Inc. File No. 20-047NE-0987-1

Dear Mr. Tross:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following Appraisal Report.

The subject property consists of a two, low-rise apartment buildings located at 125 6th Avenue in Clifton, Passaic County, New Jersey. The improvements are situated on a total of 4,826-square feet and were built in 1927. The subject is comprised of 11 rent-controlled apartment units within an estimated 8,250-square feet of net rentable space. Additionally, the subject includes an estimated 1,100-square feet of ground level commercial space that is currently 100.0% occupied. The property includes surface parking and a laundry facility.

The subject was 100.0% leased for residential units according to the rent roll provided. Due to the outbreak of COVID-19 virus which was declared by the World Health Organization as a global health emergency on January 30, 2020, we have only conducted an exterior and Zoom inspection, as approved by the client. We have relied on management of the subject building to communicate the details of all interior improvements on-site and interior pictures, as well as a PCA report provided. The subject is more fully described, legally and physically, within the enclosed report.

Additionally, the subject is currently in receivership. We have included the following statement provided from an inventory report by Colliers International for further explanation of the subject's current position.

Scott T. Tross
October 12, 2020

<u>Wells Fargo Statement of the Case</u>: In this action, plaintiff Wells Fargo Bank, N.A. seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

Therefore, due to the subject's current situation, we have not been provided with historical documents. As a result, we have made a series of extraordinary assumptions highlighting missing documents and our reliance on market expenses and the rent roll provided in estimating market value. Additionally, the balance sheets and partial T11 provided are included in the addenda of this report and are not useful for the purposes of estimating income/expenses attributable to the real property being appraised.

We have been provided with a Property Condition Assessment prepared by EMG dated November 20, 2019 for the subject. The report indicates the subject in need of immediate repairs for an estimated $5,250. Please refer to the improvement section of the report and addenda for further detail on deferred maintenance at the subject.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | September 14, 2020 | $1,550,000 |

Compiled by CBRE

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

As of the date of value and the date of this report, the nation, region, and market area are impacted by the COVID-19 pandemic. This could have a prolonged effect on macroeconomic conditions, though at this time the length of duration is unknown. The perceived impact on real estate varies on several factors including asset class, use, tenancy, and location.  Our analysis considers available information as of the effective date.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by



Scott T. Tross
October 12, 2020

any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE, Inc. can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

_____
Justin Casson, MAI
Director
NJ State Certification No: 42RG00265400

Phone: (212) -715-5749
Email: justin.casson@cbre.com

_____
Mark Godfrey, MAI, MRICS
Senior Managing Director
NJ State Certification No.: 42RG00257500

Phone: (212) 715-5719
Email: mark.godfrey@cbre.com



# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.
4. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
5. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
6. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New Jersey.
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. As of the date of this report, Sara Killough has completed the continuing education program for Practicing Affiliates of the Appraisal Institute.
11. As of the date of this report, Justin Casson, MAI and Mark Godfrey, MAI, MRICS have completed the continuing education program for Designated Members of the Appraisal Institute.
12. Sara Killough and Justin Casson, MAI have and Mark Godfrey, MAI, MRICS has not made a personal inspection of the property that is the subject of this report.  CBRE inspected the subject's exterior but did not conduct an interior inspection as authorized by the client. Therefore, we have relied on photographs and descriptions provided by the property manager, as well as the PCA report provided by Colliers.  It is assumed that the quality, condition, and level of build-out is accurate and that there are items of deferred maintenance.
13. Sara Killough has provided significant real property appraisal assistance in respect to research analysis and writing portions of the overall report in conjunction to the persons signing this report.
14. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

i



15. Sara Killough, Justin Casson, MAI and Mark Godfrey, MAI, MRICS have not provided services, as appraisers or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.


_____
Justin Casson, MAI
NJ State Certification No: 42RG00265400

_____
Mark Godfrey, MAI, MRICS
NJ State Certification No.: 42RG00257500

## Subject Photographs



Aerial View

125 6th Avenue, Clifton, NJ







**Exterior View of Subject**

**Exterior View of Subject**





**View of Commercial Space**

**View of Common Hallway**





**Typical Kitchen**

**Typical Bathroom**







**Typical Living Area**

**Typical Bedroom**





**View of Roof**

**View of Individual Boilers**





**View of Individual Hot Water Heaters**

**View of 6th Avenue**

*125 6th Avenue, Clifton, NJ*

v





**View of 6th Avenue**

As previously noted, all interior photographs have been obtained by the zoom inspection performed as well as by the subject's property manager.



# Executive Summary

| | |
|---|---|
| **Location** | 125 6th Avenue, Clifton, Passaic County, NJ 07011 |
| **Parcel** | Block 16.09  Lot 11 |
| **Client** | Herrick |
| **Highest and Best Use** | |
| As If Vacant | Residential |
| As Improved | Apartment |
| **Property Rights Appraised** | Leased Fee Interest |
| **Date of Inspection** | September 14, 2020 |
| **Estimated Exposure Time** | 6 - 9 Months |
| **Estimated Marketing Time** | 6 - 9 Months |
| **Land Area** | 0.11 AC        4,826 SF |
| **Zoning** | R-B1 (Residential One & Two-Family) |
| **Improvements** | |
| Property Type | Apartment        Mixed-Use |
| Number of Buildings | 2 |
| Number of Stories | 2 + Basement |
| Gross Building Area | 10,800 SF |
| Net Rentable Area Estimated | 8,250 SF |
| Commercial Space Estimated | 1,100 SF |
| Number of Units | 11 |
| Average Unit Size | 750 SF |
| Year Built | 1927 |
| Condition | Average |
| **Buyer Profile** | Investor-Local |
| **Financial Indicators** | |
| Current Occupancy | 100.0% |
| Stabilized Occupancy | 96.0% |

| **Pro Forma Operating Data** | *Total* | *Per Unit* |
|---|---|---|
| Effective Gross Income | $159,035 | $14,458 |
| Operating Expenses | $61,942 | $5,631 |
| Expense Ratio | 38.95% | |
| Net Operating Income | $97,093 | $8,827 |

| **VALUATION** | *Total* | *Per Unit* |
|---|---|---|
| Sales Comparison Approach | $1,500,000 | $136,364 |
| Income Capitalization Approach | $1,550,000 | $140,909 |
| **Insurable Value** | $990,000 | $90,000 |

### MARKET VALUE CONCLUSION

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | September 14, 2020 | $1,550,000 |

Compiled by CBRE



As of the date of value and the date of this report, the nation, region, and market area are impacted by the COVID-19 pandemic. This could have a prolonged effect on macroeconomic conditions, though at this time the length of duration is unknown. The perceived impact on real estate varies on several factors including asset class, use, tenancy, and location.  Our analysis considers available information as of the effective date.

## STRENGTHS, WEAKNESSES, OPPORTUNITIES AND THREATS (SWOT)

### Strengths/ Opportunities

- Market demand for apartment units is strong within the local area, and the subject property benefits from this situation.
- Commercial investment activity and interest increased during 2010 and has continued into 2020.
- The subject is 100.0% occupied.

### Weaknesses/ Threats

- Increased uncertainty and risk associated with COVID-19 (see discussion below). Most participants anticipate with the greatest impact felt in the next 3-9 months.
- Difficulty in collecting full rental payments during a pandemic.

## COVID-19 IMPACT

The outbreak of the Novel Coronavirus (COVID-19), declared by the World Health Organisation as a "Global Pandemic" on the 11th March 2020, has impacted global financial markets. Travel restrictions have been implemented by many countries. Market activity is being impacted in many sectors. As at the valuation date, we consider that we can attach less weight to previous market evidence for comparison purposes, to inform opinions of value.  Indeed, the current response to COVID-19 means that we are faced with an unprecedented set of circumstances on which to base a judgement. Our valuation is therefore reported as being subject to 'material valuation uncertainty' as set out in VPS 3 and VPGA 10 of the RICS Valuation – Global Standards. Consequently, less certainty – and a higher degree of caution – should be attached to our valuation than would normally be the case. Given the unknown future impact that COVID-19 might have on the real estate market, we recommend that you keep the valuation of this property under frequent review. For the avoidance of doubt, the inclusion of the 'material valuation uncertainty' declaration above does not mean that the valuation cannot be relied upon. Rather, the declaration has been included to ensure transparency of the fact that – in the current extraordinary circumstances – less certainty can be attached to the valuation than would otherwise be the case.  The material uncertainty clause is to serve as a precaution and does not invalidate the valuation.



## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have included the following statement provided in an inventory report by Colliers International for further explanation of the subject's current position.

  Wells Fargo Statement of the Case: In this action, plaintiff Wells Fargo Bank, N.A. seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

  Additionally, the balance sheets provided are included in the addenda of this report, are not useful for the purposes of estimating income/expenses attributable to the real property being appraised.

- Since we have not been provided unit measurements by ownership, we have employed the extraordinary assumption that our estimated gross building area and net rentable square footage measurements are considered reasonable and exemplify the subject accurately.

- Although requested, we have not been provided with historical operating statements or a pro forma for the subject. Therefore, we employ the extraordinary assumption that our expense estimates reflect current market standards.

- Although requested, we have not been provided with a rent roll stating the most recent lease expiration dates. The rent roll only lists lease start dates with no expiration. Therefore, we employ the extraordinary assumption that the rent roll provided is accurate with the current rental rates tenants are paying for their lease agreement, which is assumed to be at one year's length of time. If there is any change in the rental rates provided for this appraisal, it may cause a material impact.

- It was reported that the subject abides by rent control regulations of Clifton, which is a contributory factor to the low rents currently being achieved. Therefore, we employ the extraordinary assumption that the subject is under rent control and the rents provided for each unit are reflective of the permitted annual rental increases within the city. This further shows the rental difference between the subject and market rent standards. Additionally, the subject is occupied with long term tenants that have experienced minimal annual rental increases.

- We have not been provided with the permitted legal rents for the subject by the City of Clifton. If the provided rental rates for each unit are to differ from what is legally allowed, it may materially impact value.

- As previously mentioned, the subject has multiple items of deferred maintenance to be cured. We have been provided with a Property Condition Assessment prepared by EMG dated

---

 [1] The Appraisal Foundation, *USPAP, 2020-2021*



November 20, 2019 for the subject. The report indicates the subject in need of immediate repairs within a year's time for an estimated $5,250. We have included the reported deferred maintenance expense within our analysis as a below-line deduction.

- It has been reported by the property manager that commercial tenant, Asmad Beauty Salon, lease expired in March 2019. The tenant has reported signing a new lease, however, was unable to provide a copy. We have made the extraordinary assumption that the tenants lease has been extended on a month-to-month basis at this point of time and the rent rate listed within the rent roll provided is accurate. If the amended lease terms differ from the original lease or the reported monthly rental rate are to differ, the appraisal may be materially impacted.

- The lease provided for H&M Food Market indicates an expiration date of September 30,2020. We have assumed the tenant has exercised its renewal option and have made the extraordinary assumption the tenant is paying the annual rental rate according to the options provided in the lease. If the amended lease differs from the option rental outline within the original lease, the appraisal may be materially impacted.

The use of these extraordinary assumptions may have affected the assignment results.

## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

## OWNERSHIP AND PROPERTY HISTORY

| OWNERSHIP SUMMARY | |
| --- | --- |
| | Current |
| Owner: | ALJO NORSE LLC |
| Date Purchased: | Mar 23, 2010 |
| Legal Reference | Tax Records |
| County/Locality Name: | Passaic |
| Pending Sale: | No |
| Change of Ownership - Past 3 Years | No |
| Compiled by CBRE | |

To the best of our knowledge, there has been no ownership transfer of the properties during the previous three years and the subject is currently not being marketed or under contract of sale.

## EXPOSURE/MARKETING TIME

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold.  This reasonable time frame can either be examined historically or prospectively.  In a historical analysis, this is referred to as exposure time.  Exposure

---

[2] The Appraisal Foundation, *USPAP, 2020-2021*



time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value.  On a prospective basis, the term marketing time is most often used.  The exposure/marketing time is a function of price, time, and use.  It is not an isolated estimate of time alone.  In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- exposure/marketing time information from the PwC Real Estate Investor Survey; and
- the opinions of market participants.

Our valuation is predicated on a buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. The COVID-19 pandemic has resulted in logistical constraints on property transactions such as inability to travel for due diligence/tours and closing of municipal agencies for closing/recording sale transactions.  In addition, some buyers and sellers have paused or postponed transacting amid the pandemic.  As of the effective date of this appraisal, this has extended the reasonable time period in which the subject could be brought to market and sold.   In light of the COVID-19 pandemic and prevailing market conditions, we would anticipate a longer marketing period relative to the exposure period.  The following table presents information derived from various sources and our conclusion.

| EXPOSURE/MARKETING TIME DATA | | |
|---|---|---|
| | Exposure/Mktg. (Months) | |
| Investment Type | Range | Average |
| *PwC Apartment* | | |
|    National Data | 1.0  -  9.0 | 3.9 |
| Local Market Professionals | 3.0  -  12.0 | 9.0 |
| **CBRE Exposure Time Estimate** | **6 - 9 Months** | |
| **CBRE Marketing Period Estimate** | **6 - 9 Months** | |
| Source: PwC Real Estate Survey | | |

The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.



# Table of Contents

Certification ................................................................................................................. i

Subject Photographs.................................................................................................. iii

Executive Summary.................................................................................................... vii

Table of Contents ...................................................................................................... xii

Scope of Work............................................................................................................ 1

Area Analysis ............................................................................................................. 5

Neighborhood Analysis .............................................................................................. 10

Site Analysis .............................................................................................................. 19

Improvements Analysis .............................................................................................. 21

Zoning........................................................................................................................ 24

Tax and Assessment Data.......................................................................................... 25

Market Analysis ......................................................................................................... 26

Highest and Best Use ................................................................................................ 40

Insurable Replacement Cost ...................................................................................... 42

Sales Comparison Approach ...................................................................................... 44

Income Capitalization Approach ................................................................................ 48

Reconciliation of Value .............................................................................................. 63

Assumptions and Limiting Conditions........................................................................ 64

ADDENDA

A   Improved Sale Data Sheets

B   Operating Data

C   Client Contract Information

D   Qualifications



# Exhibit C

December 18, 2020

Joseph Brecher
Executive Managing Director
Gebroe Hammer Associates
2 West Northfield Road
Livingston, NJ 07039
Email:  Joe Brecher <jbrecher@gebroehammer.com>

**RE:      Purchase LOI**

Dear Mr. Brecher,

This will serve as our Letter of Intent (LOI) and general outline of the terms and conditions for the prospective purchase of the subject property. This LOI is not legally binding on either party, except as hereafter set forth. It is, however, an indication of good faith intent between the parties to be detailed in a future contractual agreement if the parties so agree.

**Seller:**                                 c/o Colliers International

**Purchaser:**                          Stonegate Buildings and/or assignee(s)

**Property:**

| Address | City, State | Approximate # of Units | Price |
|---|---|---|---|
| 125 6th Street | Clifton, NJ | 14 | $  1,950,000 |

***Total Purchase Price:***                                                          **$1,950,000.00**

**Total Purchase Price:**     **$1,950,000**.  The balance of the Purchase Price as adjusted for closing prorations and less credit for the Deposit, shall be paid by Purchaser to Seller in cash via wire transfer at the Closing.

**Purchase and Sale Agreement (the PSA):** The parties shall begin negotiations concerning the terms of a PSA mutually satisfactory to both parties, which shall supersede the terms of this LOI, unless otherwise indicated herein. The PSA will be prepared by the Seller's counsel and submitted to the Purchaser for review and be subject to Court approval.

**Court Approval:** Purchaser understands this offer is subject to Court approval in the case filed in the United States District Court for the Plaintiffs, as (i) U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC. MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-SB51 et al v. ENGLEWOOD FUNDING, LLC et al., Civil Action No. 2:19-CV-17865 (MCA)(LDW) (the "U.S. Bank Action"), and (ii) PORTAL et al v. LEVINE et al., Civil Action No. 2:19-CV- 19611 (MCA)(LDW) (the "PORTAL Action"), and (iii) JLS EQUITIES LLC v. RIVER FUNDING LLC et al., Civil Action No. 2:19-CV-17615 (MCA)(LDW).

**Deposit:** The initial deposit shall be **$50,000** to be paid upon mutual execution of the PSA. This deposit is refundable upon cancellation of this contract by either party prior to the end of the Due Diligence Period. Upon satisfactory completion or Purchaser's waiver of the Due Diligence Period, the Deposit shall become nonrefundable.

**Due Diligence:** Purchaser shall have a twenty (20) day Due Diligence period that shall commence on the date following the date of execution of the PSA by Seller and Purchaser. Purchaser shall have the right to terminate as a result of Purchaser's dissatisfaction with the results of its due diligence investigation and receive a full refund of the Deposit in such case.

**Closing and Closing Costs:** Closing shall occur on the later of (i) sixty (60) days from the expiry of the Due Diligence period or (ii) 10 days from the date that Court Approval is granted. Purchaser shall be responsible for the costs of its due diligence including its own third-party fees and legal costs, and any expenses incurred by Purchaser prior to Court Approval. Closing costs shall otherwise be incurred by Seller and Purchaser as is customary in the local market. Notwithstanding the foregoing, Purchaser shall have the option to extend the closing date by an additional thirty (30) days by posting an additional non-refundable deposit of **$20,000**.

| | |
|---|---|
| **Contingency:** | This agreement is not subject to any contingencies other than those contained herein. |
| **Prorations:** | Taxes, utilities, operating expenses, rents and other customarily apportioned items will be prorated or apportioned as of Closing. |
| **Brokerage:** | Purchaser and Seller acknowledge the only brokers that are due a commission on the consummation of this transaction are Gebroe Hammer Associates. Gebroe Hammer Associates shall be paid a commission by the Seller. Said commission will be the sole responsibility of the Seller. |
| **Confidentiality:** | The existence of this proposal, the Seller's and Purchaser's response thereto, and all subsequent correspondence and the requirements stated therein are confidential and may not be disseminated or disclosed by either party, except as required by law or a court of competent jurisdiction. |

This letter shall serve as an expression of interest only and does not bind Purchaser or Seller in any way, except for the provision regarding Confidentiality set forth above. No discussion, negotiation or verbal agreement regarding the proposed transaction and no presentation, negotiation or revision of any document regarding the proposed transaction, shall constitute a contract or evidence of a contract, and there shall be no binding agreement, unless and until a written agreement is executed by and delivered to all parties.

If you agree to the terms and conditions described in this letter, please sign below. We look forward to working with you on this transaction.

Sincerely,

**Purchaser**

**Stonegate Buildings**

Signature: _____

Name:   Steven Gelbtuch

Title:

Date:  December 18, 2020

**Seller**

Signature:_____

Name:____Richard J. Madison_____

Title:____Executive Managing Director____

Date: _____
        12/22/2020